# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JASMINE SARTAIN**                                    **CIVIL ACTION**

**VERSUS**                                                      **NO. 16-1952**

**DARREL VANNOY**                                  **SECTION: "J"(3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Jasmine Sartain, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On October 4, 2007, he was convicted of second degree murder under Louisiana law.[1] On November 9, 2007, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On December 30, 2008, the

---

[1] State Rec., Vol. 10 of 13, transcript of October 4, 2007, p. 63; State Rec., Vol. 6 of 13, minute entry dated October 4, 2007; State Rec., Vol. 6 of 13, jury verdict form.
[2] State Rec., Vol. 10 of 13, transcript of November 9, 2007, p. 10; State Rec., Vol. 6 of 13, minute entry dated November 9, 2007.

Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on October 30, 2009.[4]

Petitioner thereafter sought state post-conviction relief.[5]  Relief was denied by both the state district court[6] and the Louisiana Fourth Circuit Court of Appeal.[7] Petitioner then filed two writ applications with the Louisiana Supreme Court; that court refused to consider one of those applications because it was untimely[8] and denied the other.[9]

After the state post-conviction proceedings concluded, petitioner, through counsel, filed the instant federal application seeking habeas corpus relief.[10]  The state has filed a response conceding that the application is timely but arguing that petitioner is not entitled to relief.[11]

**<u>Standards of Review</u>**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

---

[3] <u>State v. Sartain</u>, 2 So.3d 1132 (La. App. 4th Cir. 2008); State Rec., Vol. 6 of 13.
[4] <u>State v. Sartain</u>, 21 So.3d 274 (La. 2009); State Rec., Vol. 6 of 13.
[5] State Rec., Vol. 1 of 13.
[6] State Rec., Vol. 2 of 13, Judgment dated December 12, 2014.
[7] <u>State v. Sartain</u>, No. 2015-K-0116 (La. App. 4th Cir. Mar. 24, 2015); <u>State v. Sartain</u>, No. 2015-K-0183 (La. App. 4th Cir. Mar. 24, 2015); State Rec., Vol. 11 of 13.
[8] <u>State ex rel. Sartain v. State</u>, No. 2015-KH-0925 (La. Dec. 7, 2015); State Rec., Vol. 13 of 13.
[9] <u>State v. Sartain</u>, 182 So.3d 953 (La. 2016); State Rec., Vol. 13 of 13.
[10] Rec. Doc. 1.
[11] Rec. Doc. 12.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute*

> *for ordinary error correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state court's ruling*
> *on the claim being presented in federal court was so lacking in justification that*
> *there was an error well understood and comprehended in existing law beyond any*
> *possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## **Facts**

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of

this case as follows:

> N.O.P.D. Reserve Off. Bruce Bono testified that on the afternoon of March
> 19, 2006, he was working a paid detail at a second line parade.  Off. Bono testified
> that he had his motorcycle parked at the corner of S. Derbigny Street and
> Washington Avenue, making sure that no vehicles turned onto Washington.  Off.
> Bono testified that the parade had stopped when he observed a Volvo stop at the
> corner.  Off. Bono testified that he saw the defendant Jasmine Sartain exit the car
> from the front passenger seat.  Off. Bono stated that he looked away, and he soon
> heard several gunshots.  He stated that he looked back in time to see Sartain shoot
> a man.  Off. Bono testified that he drew his weapon and ordered Sartain to stop.  In
> response, Sartain turned and fled towards the Volvo.  Off. Bono fired at Sartain
> three times, and Sartain entered the car and then exited through the driver's door
> and ran toward S. Claiborne Avenue.  Off. Bono gave chase, and soon he saw
> another officer coming toward them from the opposite direction.  Off. Bono
> testified that Sartain threw his gun under a vehicle parked along the street and
> surrendered.  Off. Bono testified that when he turned around after hearing the first
> shots, he did not see anything in the victim's hands, and he stated that he had not

noticed the victim prior to the shooting.  He testified that he did not hear anyone say to watch out prior to hearing the first shots.  He also did not notice Sartain speaking with any females prior to the shooting.  He estimated that thirty seconds to a minute elapsed between the time he saw Sartain exit the Volvo and when he heard the shots.  He also estimated that he was twenty to twenty-five feet from Sartain when he turned and saw Sartain shoot the victim.  He testified that he surrendered his gun to officers who arrived to investigate the shooting.

On cross-examination, Off. Bono testified that he saw nothing unusual when the Volvo pulled up to the corner.  He stated that Sartain fell to the ground after throwing his gun under the parked vehicle.  He testified that he did not investigate the shooting and did not know if anyone found any witnesses to the shooting.  On redirect, Off. Bono testified that the last shot he heard was the one he saw Sartain shoot at the victim.  He stated that the victim's back was to a fence, and there were other people about five feet from the shooting scene.

Sgt. Christopher Goodly of the N.O.P.D. Traffic Division testified that he was also working a detail for the parade, and he was located at the corner of Washington and S. Claiborne.  He testified that the bulk of the parade was at S. Derbigny and Washington, where Off. Bono was stationed.  Sgt. Goodly testified that he heard shots and saw the crowd scattering.  He stated that he saw Off. Bono firing his gun and saw a shot hit a Volvo.  He stated that the driver's door to the car was open, and he saw a man emerge from the car with a gun in his hand.  He stated that the man, whom he identified as Sartain, ran toward him.  He stated that Sartain was not looking at him, but rather he was waving his gun around, and Off. Bono was running after Sartain.  He stated that he heard Off. Bono yell that "he dropped it."  He then stepped into Sartain's path, and Sartain dropped to the ground.  Sgt. Goodly testified that he handcuffed Sartain and waited for other officers to arrive.  He stated that he located a gun under a vehicle parked at the side of the street that resembled the gun that he had seen in Sartain's hand.  He stated that he called for backup and for EMS personnel.

On cross-examination, Sgt. Goodly testified that he apprehended Sartain at approximately the middle of the block.  He stated that although it took some time for crime lab personnel to arrive on the scene, he and other officers secured the scene as soon as the other officers arrived.  Although he admitted that it was possible that someone could have picked up evidence before the scene was secured, he stated that it was highly unlikely that anyone had done so because he saw no non-police people in the area after the shooting as they had all run away when the shooting started.

Det. Larry Green testified that he directed the investigation of the shooting.  He stated that Sartain and the two shooting victims had been transported to hospitals by the time he arrived on the scene.  He testified that he directed Det. Bethea to visit Sartain at one hospital and he directed Off. Waguespack to visit the victims who had been transported to another hospital.  He identified various photographs taken at the scene.  He stated that after the other officers had spoken with one of the victims and with the suspect, he ordered that Sartain be arrested.  He stated that

he prepared the police reports in the case. Det. Green testified that he did not interview anyone on the scene, nor did he assign anyone to go back out to the scene to interview people in the area. He stated that no one came forward to give information about the shooting, and he denied that anyone named Kayla Boatner contacted the police to speak about the shooting.

Off. George Waguespack testified that he went to the hospital where the two shooting victims had been taken. He identified the victims as Christopher Smith (the deceased) and a bystander named Roosevelt Webster, who had been wounded in the shootout. Off. Waguespack testified that he briefly spoke with Webster, who had a minor wound to his leg and who was treated and released. He stated that he tried to speak with Smith, but he was unable to do so because doctors were tending Smith's wounds. Off. Waguespack testified that he collected Smith's clothing and a bullet that fell from the clothing as it was being removed from Smith's body.

Det. Ronald Ruiz testified that the Volvo was towed from the scene after the crime lab finished processing the scene. He stated that he obtained a search warrant for the Volvo and searched it the day after the shooting. He stated that the Volvo had a bullet hole in the front passenger door, and he collected a bullet from inside the door. He stated that he also seized from the car a photograph depicting Sartain, an unknown female, and a gun.

Det. Gus Bethea testified that he briefly went to the scene of the shooting and then went to the hospital where Sartain had been taken. He stated that Sartain was waiting to be treated in the emergency room when he arrived, and a doctor there told him that Sartain had not been given any medication at that time. Det. Bethea testified that he introduced himself to Sartain and advised Sartain of his rights. He stated that Sartain indicated that he understood his rights and wanted to waive them to give his side of the story. Det. Bethea testified that Sartain told him that he was in the Volvo with Mitchell Lee and Brendel Edwards, and they had stopped at the intersection to speak with some females. Sartain told Det. Bethea that all three men exited the car, and then they saw Smith approaching them from behind a car. Sartain told Det. Bethea that Smith had a gun and began shooting at them, so he and his friends pulled their guns and returned fire. Sartain told Det. Bethea that the last thing he remembered was being shot by a police officer.

Det. Bethea testified that he recorded Sartain's statement on a device that would allow him to burn a CD or put it on a computer's hard drive. However, the device malfunctioned, and he was unable to store it or burn a CD. Det. Bethea stated that he took notes during Sartain's statement, and he gave the notes to Det. Green. Det. Bethea stated that he did not interview either Lee or Edwards, and he did not know if anyone else interviewed them. On cross-examination, Det. Bethea stated that Sartain had a gunshot wound to his leg, and he interviewed Sartain approximately three hours after the shooting and prior to his surgery.

The parties stipulated that Dr. Richard Tracy was an expert in forensic pathology. Dr. Tracy testified that he conducted the autopsy on Christopher Smith. Dr. Tracy testified that Smith sustained five gunshot wounds, one of which was

almost immediately fatal.  Dr. Tracy could not determine the chronological order of the wounds, but he identified them as:  (1) a wound that entered the left side of Smith's face near the mouth and exited below his jawbone; (2) a wound that entered the left side of Smith's chest under the elbow and exited near the spine, but did not strike any vital structure; (3) another wound parallel to wound (2), also not fatal; (4) a wound that entered the lower left chest and struck the renal artery, the left kidney, and the left lung, and then exited near the spine; and (5) a superficial wound just beneath the skin of Smith's thigh, just below the groin.  Det. Tracy testified that the fourth wound was the fatal wound, with the damage causing massive bleeding.  Dr. Tracy stated that none of the wounds showed any gunpowder residue or stippling that would be present if the shots had been fired from near the victim.

Det. Kenneth Leary was qualified as an expert in firearms examination.  He examined the two guns seized in this case, Off. Bono's gun and the gun seized from under the vehicle where Off. Bono saw Sartain throw his gun, as well as various casings and bullets recovered from the scene and from the Volvo.  Det. Leary testified that his examination indicated that casings found on the scene were fired from both Off. Bono's gun and the gun recovered from under the vehicle, but none of the casings found on the scene were fired from a third gun.  Det. Leary thus testified that there was no indication from the evidence found at the scene that a third gun was involved in the shooting.

Off. Chana Pichon testified that she was the crime lab technician who processed the scene of the shooting.  Off. Pichon testified that she photographed the scene and collected the evidence.  She stated that other officers had secured the scene by the time she arrived.  She stated that she did not search through any leaves that may have been in the gutter of the street, nor did she use a metal detector at the scene.

The defense called Kayla Boatner, who stated that she was a former girlfriend of Sartain.  Ms. Boatner testified that she moved to Texas after Hurricane Katrina, but on the day of the shooting she was visiting in New Orleans, and she and her friend Makiah were on Washington Avenue watching the second line parade.  Ms. Boatner testified that she heard someone call her name, and she saw Sartain sitting in a car at the corner.  Ms. Boatner stated that she and Makiah walked over to the car, and Sartain and one of his companions exited the car to talk with them.  She stated that she and Sartain spoke for a short time, and then Makiah screamed, "He got a gun!"  Ms. Boatner testified that she looked up and saw a man approaching them.  She stated that she warned Sartain to watch out, and Sartain drew a gun.  She stated that Makiah grabbed her, and the two women ran from the scene.  She testified that she heard gunshots as they ran.  Ms. Boatner testified that the man she saw with the gun was named Chris, but she did not know him.

On cross-examination, Mr. Boatner testified that she had seen Chris twice before, and Sartain had told her that his name was Chris.  Ms. Boatner testified that she returned to Texas the day after the shooting, but she kept in contact with Sartain while he was in jail.  She stated that she did not contact the police concerning the shooting because she did not know whom to call.  She stated that the defense

attorney contacted her shortly before trial.  She insisted that although she had dated Sartain sporadically for six years, she would not lie for him because he cheated on her during those six years.

Makiah Bickham testified that she was with Ms. Boatner at the scene of the shooting.  She stated that as she and Ms. Boatner were walking down Washington, someone called Ms. Boatner's name.  She stated that she and Ms. Boatner walked toward the car, and Sartain exited to speak with them.  Ms. Bickham testified that she did not pay attention to the conversation between Sartain and Ms. Boatner.  She stated that she looked up and saw a man coming from behind a car, and he was drawing a gun from under his shirt.  Ms. Bickham shouted that the man had a gun, and Ms. Boatner warned Sartain to be careful.  Ms. Bickham testified that she and Ms. Boatner ran from the scene, and she heard shots.  She testified that she did not speak with the police about the shooting.

On cross-examination, Ms. Bickham stated that she knew Sartain through his grandmother, whom she knew.  She stated that Sartain and possibly one or two of his companions had exited the car before the shooting.  She stated that she did not know the man whom she saw draw the gun, although Ms. Boatner later told her who he was.  Ms. Bickham testified that she did not contact the police concerning the shooting because she feared she would lose her job if she had to come to court to testify.

Tashaka Johnson testified that she was Sartain's girlfriend.  She stated that at the time of the shooting, she and Sartain had dated for six years and were engaged.  She stated that she was living with Sartain at his grandmother's house.  She stated that she owned a green Volvo that she let Sartain use.  She testified that she also knew Smith and had dated him in the past.  She stated that Sartain and Smith did not get along.  She testified that she was not on the scene of the shooting, and she had not willingly come to court to testify.

On cross-examination, Ms. Johnson testified she began living with Sartain at his grandmother's house when he was released from jail.  She stated that she dated Smith in middle school, and she did not think that Sartain was jealous of Smith.  She stated that she did not own a gun and had never seen Sartain with one.

Jasmine Sartain testified that he was twenty years old at the time of trial.  He stated that at the time of the shooting he was living with Ms. Johnson at his grandmother's house, and Ms. Johnson allowed him to use her car.  He stated that on the day of the shooting, he, Lee, and Edwards took the Volvo to get some food, and they encountered the second line parade.  He testified that as they were sitting at a corner, he saw Ms. Boatner and Ms. Bickham.  He stated that he exited the car to talk with them, and then he heard someone yell that someone had a gun.  He stated that he turned and saw Smith, whom he knew had dated Ms. Johnson in the past.  Sartain testified that Smith was pointing a gun at him, and he drew his gun and fired at Smith.  Sartain testified that he carried the gun because he had been shot several times by "the same young man."  The State objected, the parties conducted a bench conference, and the court instructed the jury to disregard Sartain's last comment.  Sartain testified that he and Smith were practically facing

each other when he shot Smith, and he insisted that he shot Smith before Smith could shoot him. Sartain testified that he did not remember how many times he shot Smith, and he did not remember hearing the officer warning him to stop; instead, he heard more shots and ran. He stated that he re-entered the Volvo and then exited again when bullets hit the car. He testified that he did not realize he had been shot until after he surrendered. Sartain insisted that he was not trying to harm anyone but Smith, whom he only shot in self-defense. Sartain admitted he had a prior conviction for possession of crack cocaine. He also admitted that he did not have a permit to carry his gun, but he insisted that he carried the gun because he had been shot multiple times in the past.

On cross-examination, Sartain admitted that although he shared Ms. Johnson's car, he was not driving it the day of the shooting because he did not have a driver's license. He denied looking for Smith on the day of the shooting. He admitted that he was on probation at the time of the shooting and should not have been carrying a gun. He stated that he was unsure if Smith had returned to the city after the storm, but he nonetheless carried the gun because he was afraid of Smith. Sartain denied telling the police that he and his two friends were shooting at Smith; he did not remember if his friends even had guns that day. On redirect, Sartain testified that he had not spoken with Lee or Edwards since the day of the shooting, and he did not know their whereabouts. He denied that Smith was running away from him when he shot him.

On rebuttal, the State called Off. Bono, who testified that Smith was standing near a fence when Off. Bono saw Sartain shoot him. Off. Bono testified that he did not see anything in Smith's hands, and Smith was not shooting at Sartain.[12]

## Petitioner's Claims

## False Testimony

Petitioner's first claim is that the prosecution engaged in misconduct by "colluding" with Detective Corey Lymous to present false testimony in violation of Napue v. Illinois, 360 U.S. 264, 269 (1959). In support of that claim, petitioner notes that Lymous testified that he was the investigating officer with respect to a 2004 incident in which petitioner was shot. However, petitioner contends that Lymous' testimony was false in that records indicate that Lymous was not involved in the investigation.

---

[12] State v. Sartain, 2 So.3d 1132, 1134-38 (La. App. 4th Cir. 2008); State Rec., Vol. 6 of 13.

In its response, the state argues that petitioner's <u>Napue</u> claim is unexhausted and procedurally barred.  The state is correct.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  <u>Baldwin v. Reese,</u> 541 U.S. 27, 29 (2004) (quotation marks omitted).  "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."  <u>Wilder v. Cockrell,</u> 274 F.3d 255, 259 (5th Cir. 2001) (quotation marks omitted).  That requirement applies to *all levels* of review in the state court system, meaning that a petitioner's federal claim must have been fairly presented to "*each* appropriate state court (including a state supreme court with powers of discretionary review)." <u>Baldwin</u>, 541 U.S. at 29.

As the state notes, although petitioner asserted his <u>Napue</u> claim to the state district court in the post-conviction proceedings, he omitted that claim in his related writ applications filed with the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court.  Because he has never fairly presented his <u>Napue</u> claim to the state's appellate courts, that claim is unexhausted.[13] <u>See, e.g.,</u> <u>Wade v. Cain,</u> Civ. Action No. 14-960, 2015 WL 3862774, at *17 (E.D. La. June 18, 2015) (holding that a claim is unexhausted if it was asserted in the state district court but *not* in the subsequent writ applications filed with the Louisiana Fourth Circuit Court of Appeals and the Louisiana Supreme Court).

---

[13] The Court is aware that petitioner asserted a <u>Brady</u> claim in the state's appellate courts; however, that did not serve to exhaust his <u>Napue</u> claim.  Despite the fact that both claims are based in part on the same evidence (the police report from the 2004 investigation), <u>Brady</u> and <u>Napue</u> claims are legally distinct and have different elements.

Moreover, the United States Fifth Circuit Court of Appeals has held that "when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," then the claims are likewise considered defaulted in federal court.  Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).  In the instant case, there is little doubt that any new attempt by petitioner to seek post-conviction relief based on his Napue claim would be rejected by the state courts on procedural grounds.  In fact, the Louisiana Supreme Court expressly indicated as much in its denial of petitioner's collateral-review writ application, stating:

> Relator has now fully litigated his application for post-conviction relief in state court.  Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8.  Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory.  Relator's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final.  Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review.  The District Court is ordered to record a minute entry consistent with this per curiam.[14]

As a result, petitioner's unexhausted Napue claim is procedurally barred from federal relief unless he demonstrates either that (1) both "cause" exists for his default and "prejudice" would result from the application of a procedural bar or (2) the Court's failure to address the claim would result in a "fundamental miscarriage of justice."  See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004).

---

[14] State v. Sartain, 182 So.3d 953 (La. 2016); State Rec., Vol. 13 of 13.

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Here, petitioner has made no attempt to establish cause for the procedural default of his Napue claim, and "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

In that petitioner has not met the "cause and prejudice" test, his unexhausted Napue claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). However, the United States Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup v. Delo, 513 U.S. 298, 324 (1995). Here, petitioner presents no new exculpatory evidence of the type or caliber referenced in Schlup. Moreover, overwhelming evidence of his guilt was introduced at trial. Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

For these reasons, petitioner's unexhausted Napue claim is procedurally barred and should not be considered by this Court.

Nevertheless, out of an abundance of caution, the undersigned notes that the state makes a persuasive argument that the Napue claim is meritless in any event. To obtain relief on a Napue claim, a petitioner must show that "(1) the testimony was actually false, (2) the state knew it was false and (3) the testimony was material." Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996). Here, petitioner has failed to show that Lymous' testimony was actually false, much less that the state was aware that it was false. Contrary to petitioner's assertions, and as noted in greater detail later herein in the discussion of petitioner's Brady claim, Lymous *was* involved in the investigation of the 2004 shooting as he testified, no suspect was clearly and reliably identified in that shooting,[15] and Lymous merely *speculated (but did not assert as a fact)* that his police report might have been lost in the Katrina flooding. Therefore, even if the Court were to find that the claim was not procedurally barred, it would still not warrant federal relief.

## Denial of Opportunity to Present Defense

Petitioner's second claim is that his rights were violated in that he was not allowed to present evidence in support of his contention that he acted in self-defense. Specifically, he argues that he was wrongly prevented from presenting evidence to show that he had been shot by the victim in 2004. On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he appellant contends that the trial court erred by denying his motion in limine which prevented the defense from presenting evidence of the victim's prior shooting of the appellant. By his second assignment, he argues in part that the trial court erred by denying his motion for new trial based on this argument. By his fourth assignment, he asserts that the trial court erred by denying his motion for mistrial based upon this error.[FN 1] He contends that he should have been allowed

---

[15] Rather, Lymous' police report indicates only that petitioner's mother, who was not an eyewitness, gave a *partial* name of the person she "believed" was the shooter. Moreover, the basis of that "belief" is unclear, in that petitioner, the only eyewitness who now professes that Smith was the shooter, told Lymous that he did not see or know who shot him. Rec. Doc. 1-6, pp. 66-67.

to present evidence of this prior shooting by the victim to bolster his self-defense claim.

> [FN 1]   The trial transcript reveals that the motion for mistrial referenced by the appellant in connection with this claim was actually raised in connection with Ms. Boatner's testimony that the appellant had been in jail.

Immediately prior to the start of the first day of trial, the defense moved to allow it to introduce evidence that the victim Christopher Smith shot the appellant on September 26, 2004 on Frenchmen Street.  Defense counsel indicated that he had no police report concerning the incident but he had hospital records that showed that the appellant was shot six times on that date.  The court noted its consternation that the defense had waited until the start of trial to first mention this incident.  The State noted that it had no police report on this incident, but it had information that two years prior to this supposed shooting, the appellant shot Smith.  Nonetheless, the State had no plans to introduce evidence of the 2002 shooting.  The court issued an instanter subpoena for the officer who investigated the 2004 shooting, but the court indicated that it would not allow testimony about this shooting unless there was something other than the appellant's testimony to show that Smith had shot him.  The court tabled the motion and warned both sides not to mention the incident during voir dire.  The State filed a motion in limine to prohibit any questioning concerning the 2004 incident, which the court granted.  The defense noted its objection.

On the next day of trial, the State re-urged its motion in limine, and the court replied that it had already ruled on the motion, noting that it had nothing before it, other than the appellant's anticipated testimony, showing that Smith had shot the appellant.  The court noted that it would allow the defense to present evidence that Smith was armed at the time of the murder.  Defense counsel noted that the appellant told others at the scene of the 2004 shooting that Smith had shot him, but the court noted that it had nothing else before it showing that Smith was the shooter in that incident.  The State noted that it had been in contact with the investigating officer for the 2004 shooting, and he did not have a copy of the police report.  The State also noted that it had run the date and place of the shooting in its computer, and it could find no police report concerning it.  The court cautioned both sides not to mention the 2004 shooting during opening statements.

Later that day, during the lunch break, the court noted that it had reviewed the medical records, and they did not contain any information concerning who shot the appellant.  The court noted that it would not allow the defense to present this evidence, terming it misleading and confusing to the jury, and it noted that the only evidence of the identity of the shooter in the 2004 incident was the appellant's own self-serving statement that Smith shot him.  Defense counsel reiterated that the appellant told others on the scene that Smith shot him, and the court asked if he told this to the police.  When defense counsel responded that no one was ever arrested

for the shooting, the court rejoined that was because the appellant did not tell them who shot him. Defense counsel insisted that the appellant's mother told an officer that Smith had shot him, and the officer indicated that he knew of Smith. Counsel stated that the shooting occurred in front of the house of Tashaka Johnson, the appellant's girlfriend, and the appellant told her that Smith had shot him. Counsel admitted, however, that Ms. Johnson did not see the shooting because she was inside when it occurred. The court then again denied the motion to introduce this evidence.

Still out of the jury's presence, the court called Det. Corey Lymous, the officer who investigated the 2004 shooting. Det. Lymous did not have a copy of the police report, but he testified that he remembered that the appellant had been shot. He stated that he did not remember if he actually spoke with the appellant, but he did speak with the appellant's mother. He stated that if she had given him the name of the perpetrator, he would have arrested that person. He indicated that the shooting would have generated a police report. He testified that he did not remember interviewing Ms. Johnson. He indicated that he could not remember for certain what he was told during the investigation, but he stated that he was one hundred per cent sure that no suspect was developed in the shooting, and if anyone had given him a name, he would have obtained a warrant for that person's arrest. He also stated that if Christopher Smith's name had been given to him, it would have been reflected on Smith's rap sheet. He testified that he remembered the shooting because the appellant was well-known in the neighborhood, he remembered that the appellant was in the ICU at Charity Hospital, and he remembered speaking with the appellant's mother.

Defense counsel then stated that Ms. Johnson and her sister were available to testify as to the 2004 shooting, and he indicated that he wanted to call these witnesses and the appellant and his mother for the limited purpose of testifying that the appellant told an officer on the scene who shot him. The court denied that request. Det. Lymous then returned to the stand, and the State showed him a printout for calls for police service for September 26-30, 2004 for the block where the shooting supposedly occurred, and the printout showed no calls involving shootings or guns.

During Ms. Boatner's testimony, when identifying the man she said had a gun, she stated that he was named Chris and that she had seen him after "the first incident," possibly a reference to the 2004 shooting.

The next day of trial, defense counsel reiterated his request to present evidence of the 2004 shooting, pointing out that evidence of self-defense had been elicited through the testimony of Ms. Boatner and Ms. Bickham. He argued that this evidence was necessary to show the appellant's state of mind at the time of the shooting, but the court again denied the request because there was no evidence, other than the appellant's testimony, that the victim was the person who shot him in 2004. The court stated that the defense could present evidence of self-defense, but it could not present any evidence of the 2004 shooting. The court also

admonished both parties to instruct their witnesses not to mention the 2004 shooting.

During the appellant's direct testimony, in response to counsel's question on why he was carrying a gun on the day of the shooting, the appellant replied: "Well, because prior to that I had been shot several times by the same young man ..." The State objected, and the court held a bench conference, after which it admonished the jury to disregard the appellant's last comment. The court then called a recess, during which it instructed defense counsel and the appellant not to mention the 2004 shooting. The court did not rule on the State's motion to hold the appellant in contempt.

The appellant now argues that the trial court's ruling prevented him from presenting evidence that would have corroborated his claim of self-defense and show his state of mind at the time of the shooting. In State v. Van Winkle, 94-0947, pp. 5-6 (La. 6/30/95), 658 So.2d 198, 201-202, the Court discussed a defendant's right to present a defense:

> A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. 6; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074 (La. 1989); State v. Vigee, 518 So.2d 501 (La. 1988). Due process affords the defendant the right of full confrontation and cross examination of the State's witnesses. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La. 1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
>
> Evidentiary rules may not supersede the fundamental right to present a defense. In State v. Gremillion, supra, the defendant attempted to introduce evidence that third parties, rather than the defendant, had killed the victim. The evidence consisted of a statement that the victim had made to a sheriff's deputy who investigated the crime. The statement was that he had been attacked and beaten by three white males. The trial court and the Court of Appeal both held the statement was inadmissible hearsay. We agreed that the statement was hearsay and that it did not meet any applicable exception (res gestae, dying declaration, business records). However, we concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant's right to present a defense. See Chambers v. Mississippi, 410 U.S. at 302, 93 S.Ct. at 1049. Exclusion of the statement in Gremillion impermissibly impaired the defendant's fundamental right. 542 So.2d at 1079, citing State v. Washington, 386 So.2d 1368 (La. 1980).

Similarly, in State v. Vigee, supra, we held that hearsay evidence supporting the defendant's theory of the case and undermining the State's lead witnesses was relevant; excluding it mandated reversal. The defendant may always assert that someone else committed the crime. Chambers v. Mississippi, *supra*; State v. Ludwig, 423 So.2d 1073 (La. 1982).

In Van Winkle, the defendant was arrested for the suffocation murder of her son, whose body was found in his bedroom. The defense theory was that a man who also lived in the apartment was a homosexual hustler who brought home another man, and that the two men killed the boy. To support this theory, the defense sought to question the roommate about his source of income and his sexual activities. It also sought to question the coroner about the condition of the victim's anus, the State's chemist concerning the absence of sperm in the anal swabs and whether this would automatically discount sexual activity, and bartenders at the bar that the roommate frequented concerning the nature of the bar. The trial court refused to allow this questioning, and the defendant was convicted of her son's murder. The Court reversed the conviction, finding that this ruling prevented the defendant from presenting evidence relevant to her defense that someone else committed the murder. The Court further found that the error was not harmless in that the evidence that the defendant could not introduce may have contributed to the verdict, given the fact that the evidence against the defendant was only circumstantial. The Court remanded the case for a new trial.

In State v. Stukes, 2005-0892 (La.App. 4 Cir. 10/25/06), 944 So.2d 679, writ den. 2006-2654 (La. 6/29/07), 959 So.2d 518, the defendant was convicted of two counts of aggravated battery stemming from an argument that occurred at a bar after a Saints game. The defendant exchanged words with one of the victims over a comment that the defendant made to the man's female companion, and as the man and the woman walked into the bar, the defendant opened fire and shot the man and another male companion. One of the victims, his female companion, and a disinterested witness testified that the defendant went to a nearby car and retrieved a gun, which he used in the shooting. Although the victim and his companions denied having any weapons that night, a defense witness testified that she heard the defendant say just prior to the shooting, "If you're going to shoot me, shoot me." She also testified that the man with whom the defendant was arguing reached under his shirt for a silver object. Another defense witness testified that shortly after the shooting a man hurried into the bar and handed a silver gun to someone standing by the door. The defendant testified that he shot the victim when the victim pulled a gun on him. The court did not allow the defense to call the defendant's wife to testify as to what the defendant told her when he arrived at home after the shooting concerning what had occurred at the bar. The defendant filed a motion for new trial, alleging among other things that this ruling deprived him of his right to present his defense by showing the reasons for his actions after the shooting, i.e. disposing of the gun and his clothing. The trial court granted the motion for new trial, and

the State sought writs. This court reversed, noting that the defendant and other witnesses testified as to these reasons. The court found that the defendant's wife's anticipated testimony would have at best been cumulative to the defendant's testimony.

In so finding, this court discussed other cases:

In State v. Juniors, 2003-2425 (La. 6/29/05), 915 So.2d 291, the defendant was charged with killing one man and wounding another at a business. His codefendant, who formerly worked at the business, pled guilty in exchange for his testimony against the defendant. The defendant sought to introduce three items to impeach his codefendant's credibility: (1) the portion of the hospital record of the deceased victim which stated the victim had been shot by a "disgruntled employee;" (2) the results of his codefendant's drug test taken in connection with his employment with the business; and (3) a letter purportedly written by the codefendant in which he indicated he would testify that neither of them had anything to do with the murder. The trial court refused to allow the defendant to introduce any of these items. On appeal, the Court upheld the rulings as to the first two items. With respect to the first item, the victim never regained consciousness; thus the statement as to who shot him was from an unknown declarant and as such double hearsay and inadmissible, even if the rest of the hospital record was admissible. As to the second item, the report was not prepared by the business, but rather by another company which administered the test, and the defendant did not call the person who was the custodian of that record. In addition, the Court noted that the defendant was able to introduce the codefendant's employment records which included his pink slip. Also, the Court noted that the defendant could have elicited testimony concerning the reason for the termination of the codefendant's employment, but he failed to do so. Finally, with respect to the letter purportedly handwritten by the codefendant, the Court found that the trial court erred by refusing to allow its introduction because it could have been used to impeach the codefendant. Nonetheless, the Court found the error to be harmless in light of the facts that the defendant's fingerprints were found at the scene, his gun matched a bullet found at the scene, and another witness testified that she saw a car with two men parked at the post office lot just prior to the murder, corroborating the codefendant's testimony that he waited in the car at the post office while the defendant committed the crime.

In State v. Cosey, 97-2020 (La. 11/28/00), 779 So.2d 675, the defendant was charged with the rape and murder of a twelve-year-old girl. A man who lived across the street from the scene of

the crime implicated the defendant. The trial court refused to allow the defendant to introduce evidence of the man's history of violent criminal behavior and the fact that the man killed himself after murdering his baby and the baby's mother in order to show that man could have committed the crime. The Court upheld the trial court's ruling, noting that the man's prior crimes were not similar to the present one and that the defendant was able to show that the man made obscene phone calls to the victim's mother. In addition, the defendant was able to question police officers about their failure to investigate the man, even though he lied to the police, gave them false leads, and was seen with the defendant on the night of the murder, although there was no evidence to tie him to the crime scene.

In State v. Vigee, 518 So.2d 501 (La. 1988), the State presented evidence that police officers observed a drug transaction involving two pedestrians and a seller in a car. As the officers approached the car, the pedestrians fled. The officer who stopped the car testified that he saw the driver, the defendant, reach behind him. Fearing the defendant was reaching for a gun, seeing the dome light in the car go on, and hearing the car accelerate, the officer drew his gun. He stated that when the car lurched forward, it hit him and his gun discharged, striking the defendant. The officers subsequently seized several packages of heroin from the car. By contrast, the defendant testified the car had just been purchased by a friend, and he was taking the car for a test drive when the officers stopped him. He testified that the friend directed him to stop at a certain corner, and when he did so someone approached him from behind and put a gun to his head. He testified that when he leaned to the side to avoid the gun, the gun fired, striking him. He testified he had left the car in drive, and when he was shot the car sprang forward. He contended that the car had previously belonged to a known drug dealer, and he theorized that was why the officers approached him with their guns drawn. The trial court denied his effort to introduce evidence that at the time of the offense the car belonged to a known drug dealer, as well as evidence that his friend tried to get someone to lie to give the friend an alibi. On appeal, the Court found that the trial court erred by refusing to admit this evidence. In addition, the Court found that this error was not harmless, given the fact that the jury returned a lesser included verdict of simple possession of heroin, apparently disbelieving the officers' testimony that they saw a drug transaction.

In State v. Short, 94-0233 (La.App. 4 Cir. 5/16/95), 655 So.2d 790, the defendant was charged with the aggravated rape of his stepdaughter. He wanted to present evidence to show: (1) that

his wife was having an affair and was spending his paychecks while he was offshore; (2) that the victim liked the new boyfriend better than she liked him; and (3) that several other men, including the new boyfriend, had access to the victim. The defense was not allowed to delve into these matters, and the defendant was convicted. On appeal, this court rejected his claim that he was denied the right to present a defense. The court noted the defendant was allowed to question the victim concerning her bias against him, including her wish that the defendant and her mother were not married and her wish to live elsewhere. In addition, the defendant was allowed to testify that the victim had made a similar accusation against her mother's former husband, and he was allowed to establish the existence of her mother's boyfriend at the time of the alleged rape.

In State v. Judge, 99-1109 (La.App. 3 Cir. 3/1/00), 758 So.2d 313, the defendant was accused of sexual battery. The trial court refused to allow the defense to present evidence that the victim had told a police officer that she had been raped a few years earlier, but she had not reported the crime. The defendant proffered the victim's testimony, wherein she testified an ex-boyfriend had raped her a few years earlier, but she did not tell anyone until much later that it had happened. On appeal, the defendant contended the trial court erred by not allowing this evidence to be presented to the jury. The appellate court found no error.[FN 2]

State v. Stukes, 2005-0892 at pp. 16-20, 944 So.2d at 689-690.

[FN 2] See also State v. Washington, 99-1111 (La.App. 4 Cir. 3/21/01), 788 So.2d 477, where this court found that the trial court did not err in granting a motion in limine prohibiting the defense from questioning the arresting officer about allegations made in a newspaper article concerning misconduct by the officer for which he had not been charged.

Here, the evidence that the appellant sought to introduce was designed to show that the victim shot him in 2004. The appellant sought to introduce this evidence pursuant to La. C.E. art. 404 A, which provides in pertinent part:

**A. Character evidence generally.** Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

* * *

21

**(2) Character of victim.**  (a) Except as provided in Article 412 [not applicable here], evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible ...[FN 3]

[FN 3]  The remainder of 404(A)(2), dealing with prior acts against a defendant in a domestic setting, is not applicable to the facts of this case.

In State v. Williams, 96-1587, pp. 7-8 (La.App. 4 Cir. 4/16/97), 693 So.2d 249, 253-254, this court discussed the use of character evidence with respect to the victim of a crime:

When a defendant pleads self-defense, evidence of the victim's dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant's fear of danger was reasonable.  State v. Edwards, 420 So.2d 663, 669 (La. 1982); State v. Montz, 92-2073 (La.App. 4th Cir. 2/11/94), 632 So.2d 822, 824-825, writ denied, 94-0605 (La. 6/3/94), 637 So.2d 499.

For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm.  State v. Gantt, 616 So.2d 1300, 1304 (La.App. 2nd Cir. 1993), writ denied, 623 So.2d 1302 (La. 1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm. Edwards, *supra* at 669.

Once evidence of an overt act is established, evidence of the victim's threats to the defendant and of the victim's dangerous character are admissible:  (1) to show the defendant's reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor.  Edwards, *supra* at 670.

If the purpose is to show the defendant's reasonable apprehension of danger, it must be shown that the defendant knew of the victim's prior threats or reputation.  Edwards, *supra*, at 670; State v. Eishtadt, 531 So.2d 1133, 1135 (La.App. 4th Cir. 1988).

22

> Once this knowledge is established, evidence of the victim's character, both general reputation and specific threats or acts of violence against the defendant are admissible. Edwards, *supra*, at 670.
>
> If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim's prior acts or reputation. Eishtadt, *supra* at 1135.

See also State v. Williams, 99-1581 (La.App. 4 Cir. 6/14/00), 766 So.2d 579.

Here, although the defense did not present evidence of an overt act by the victim when it first moved to introduce evidence of the earlier shooting, later both Ms. Boatner and Ms. Bickham testified that the victim drew a gun prior to the shooting. Thus, if the evidence that the appellant sought to introduce had been of the proper form, it would have been admissible. The court found that it was not admissible, however, because the only direct evidence that the victim was the person who shot the appellant in 2004 was the appellant's own testimony, which the court found to be self-serving and thus suspect. The defense admitted that the only person who saw the shooter was the appellant, and although the defense stated that the appellant's mother, his girlfriend, and her sister heard the appellant tell the police who shot him, the officer who investigated the shooting testified that no one ever identified the shooter.

The cases cited by the appellant do not show that the trial court erred by refusing to allow the defense to present evidence of the 2004 shooting because the appellant's own testimony was the only evidence that the victim perpetrated the shooting. In State v. Caldwell, 504 So.2d 853 (La. 1987); State v. Lee, 331 So.2d 455 (La. 1975); State v. Brooks, 98-1151 (La.App. 1 Cir. 4/15/99), 734 So.2d 1232; and State v. Washington, 30,043 (La.App. 2 Cir. 1/23/98), 706 So.2d 203, the courts held that the trial court erred by disallowing evidence from third parties concerning prior threats, etc., by the victim to show the defendant's state of mind. In State v. Cavalier, 421 So.2d 892 (La. 1982); State v. Schexnayder, 97-0729 (La.App. 1 Cir. 4/8/98), 708 So.2d 851; and State v. Demery, 28,396 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, the courts held that the defense failed to establish evidence of an overt act on the victim's part where the defendant was the only person to testify as to an act.[FN 4] State v. Whittaker, 463 So.2d 1270 (La. 1985) involved the admissibility of a letter written by the defendant to a friend who was also incarcerated and whom he urged to lie or be silent. In State v. Ludwig, 423 So.2d 1073 (La. 1982), the defendant sought to introduce evidence that the victim's wife had shot the victim in the foot six months before the victim's murder in an effort to show that she may have been the murderer. The Court found that although this evidence may have been slightly relevant, the trial court did not err by excluding it.

> [FN 4]   But see State v. Collins, 432 So.2d 369 (La.App. 1 Cir.1983), where the court earlier held that a defendant's testimony alone was sufficient to show an overt act by the victim.

Here, the testimony of Ms. Boatner and Ms. Bickham showed evidence of an overt act by the victim. However, the only evidence that defense could present to show that the victim shot the appellant in 2004 was the appellant's own self-serving testimony. Neither the appellant's mother, Ms. Johnson, nor her sister, who the defense intended to call to corroborate the appellant's testimony, saw the shooting; at best, they could have only testified as to what the appellant told them. Defense counsel stated that the appellant's mother could testify that she heard the appellant tell the police who shot him, but Det. Lymous emphatically testified that no one gave the police the name of a suspect. The appellant points out that a police report in the present case includes his statement that the victim shot him in 2004, but again this is the appellant's own self-serving statement. Given that the appellant was the only person who could identify the victim as the person who shot him in 2004, and that it appears that the appellant did not give the victim's name to the police during its investigation of that shooting, we conclude the trial court did not err by disallowing this testimony.

Finally, it must be noted that contrary to the court's ruling, the appellant testified that he had been shot "several times by the same young man," meaning the victim. Although the court admonished the jury to disregard this testimony, the jury was nonetheless aware of this testimony. In addition, Ms. Boatner testified that she had seen the victim's face before, after the first "incident." Thus, even though the court denied the defense motion to present evidence of the earlier shooting, the jury was aware that the appellant thought that the victim had shot him in the past.

Thus, these claims have no merit.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.

Because this claim presents a mixed question of law and fact, this Court must defer to the state court's decision denying this claim on the merits unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Boyer v. Vannoy, 863 F.3d 428, 447-49 (5th Cir. 2017). For the following reasons, the Court finds that he has made no such showing.

---

[16] State v. Sartain, 2 So.3d 1132, 1139-47 (La. App. 4th Cir. 2008); State Rec., Vol. 6 of 13.

To the extent that petitioner is contending criminal defendants have the right to present a complete defense, that is, of course, correct.  The United States Supreme Court has clearly held:

> State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  This latitude, however, has limits.  Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.

Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citations, quotation marks, and brackets omitted).  However, the Supreme Court has expressly noted:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

Id.

Here, it is clear that petitioner was shot in 2004.  However, Christopher Smith, the victim in the instant case, was never charged with that crime, and the only eyewitness who has ever identified Smith as the shooter was petitioner himself.  Therefore, the state courts found that the probative value of the evidence petitioner sought to offer was essentially nil and outweighed by concerns that the evidence would be misleading and confusing to the jury.

The issue before this federal court is not whether that state court decision was correct; rather, again, it is only whether the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  In making that determination, this Court notes that petitioner has

not identified a United States Supreme Court case that contradicts the state court decision or that involved a materially indistinguishable set of facts.  As a result, he has not shown that it was "contrary to" clearly established federal law.  Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010).  The Court further finds that petitioner likewise has not shown that the state court's decision was so egregiously wrong that it constitutes an "unreasonable application of" clearly established federal law.  Simply put, although the Supreme Court has defined the right at issue, it has not spoken on whether circumstances *such as were present in this case* would have violated that right.  Where, as here, the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

For these reasons, the Court finds that, under the rigorously deferential standards of review mandated by the AEDPA, this claim should be denied.

## Sufficiency of the Evidence

Petitioner next claims that there was insufficient evidence to support his conviction, in that the prosecution failed to prove that petitioner had not acted in self-defense and that he had the specific intent to kill the victim.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> The appellant alleges in assignment five that there was insufficient evidence adduced at trial to support his conviction.  By assignment six, he alleges that the trial court erred by denying his motion for post verdict judgment of acquittal.  By assignment two, he argues in part that the trial court should have granted his motion for new trial because the verdict was contrary to the law and evidence.  Specifically, he contends that the State did not prove beyond a reasonable doubt that he did not shoot the victim in self-defense.

The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in <u>State v. Brown</u>, 2003-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18:

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." <u>State v. Neal</u>, 00-0674, (La. 6/29/01)[,] 796 So.2d 649, 657 (citing <u>State v. Captville</u>, 448 So.2d 676, 678 (La. 1984)).
>
> When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." <u>Neal</u>, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under <u>Jackson</u> to prove guilt beyond a reasonable doubt to a rational jury. <u>Id</u>. (citing State v. Rosiere, 488 So.2d 965, 968 (La. 1986)).

See also <u>State v. Batiste</u>, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; <u>State v. Sykes</u>, 2004-1199, 2004-0947 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.

The appellant was charged with and convicted of second degree murder. Second degree murder is defined in pertinent part as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. La. R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act." Specific intent may be inferred from the circumstances and actions of the defendant. <u>State v. Brown</u>; <u>State v. Williams</u>, 2005-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567; <u>State v. Hebert</u>, 2000-1052 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041. Specific intent can be formed in an instant. <u>State v. Cousan</u>, 94-2503 (La. 11/25/96), 684 So.2d 382; <u>Williams</u>.

The appellant does not dispute that he shot the victim. Indeed, it would be hard to do so considering that Off. Bono testified that after hearing the first shots, he turned and saw the appellant shoot the victim. The appellant argues, however, that the State failed to prove that the shooting was not committed in self-defense, absolving him of guilt. In <u>State v. McClain</u>, 95-2546, pp. 8-9 (La.App. 4 Cir. 12/11/96), 685 So.2d 590, 594, this court discussed self-defense:

> A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger

27

of being killed or receiving great bodily harm and that the homicide is necessary to save himself from that danger.  La. R.S. 14:20(1).  When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.  State v. Lynch, 436 So.2d 567 (La. 1983); State v. Brumfield, 93-2404 (La.App. 4th Cir. 6/15/94), 639 So.2d 312.  Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger.  State v. Dozier, 553 So.2d 911 (La.App. 4th Cir. 1989), writ denied 558 So.2d 568 (La. 1990).  Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger.  Id.

See also Batiste; State v. Jones, 2001-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623; State v. Gibson, 99-0946 (La.App. 4 Cir. 5/3/00), 761 So.2d 670.

In Batiste, the elderly defendant shot a much younger victim after a fight over money won in a dominos game.  The defendant argued that his conviction could not stand because the victim started the fight and tried to keep him from leaving.  This court rejected this argument, noting that the defendant left the game, went to his truck, armed himself, and came back to the game table, continuing the argument that led to the shooting.

Likewise, in Jones, the defendant shot one victim to death and wounded another who came to the first victim's aid.  The defendant and the victim had fought earlier, but the victim left the area.  He soon returned and raised his hands to the defendant, who then shot the victim repeatedly as the victim tried to run away.  He shot the second victim when that victim tried to intervene.  This court rejected the defendant's claim that he only shot the intoxicated victims in self-defense, noting that the defendant could have left the area, but instead he armed himself and shot them both.

In State v. Ventry, 99-0302 (La.App. 4 Cir. 6/14/00), 765 So.2d 1129, this court rejected the defendant's self-defense claim in light of the fact that although the defendant claimed he shot the victim as the victim approached him, the victim was shot in the back.  In Gibson, this court found that the State refuted the defendant's self-defense claim.  The defendant stabbed the victim, whom she claimed was choking her as they argued.  This court noted that other witnesses who were in the house testified that they did not hear an argument prior to the stabbing.  It also pointed to the defendant's contradictory statements concerning whether the victim was choking her at the time she repeatedly stabbed him and her statement to the victim's family that she did not know why she stabbed him.  Likewise, in State v. Byes, 97-1876 (La.App. 4 Cir. 4/21/99), 735 So.2d 758, this court rejected the defendant's self-defense claim where he first stated that another person in the car

shot the victim and then later admitted that he shot the victim when the victim pulled a gun.  This court noted that two of the gunshots hit the victim in the back, and another witness testified that the defendant continued to fire after he exited the car.

In State v. Osborne, 2000-0345 (La.App. 4 Cir. 12/6/00), 775 So.2d 607, the larger, younger victim threatened the elderly defendant and hit him, knocking the defendant to the ground.  The victim left the scene after others broke up the fight, but he returned and again threatened the defendant and his female friend.  The defendant walked a short distance away, obtained and loaded a gun, and then returned to the scene.  He shot the victim twice, the second time because he was not sure if the first shot hit the victim.  Although the victim was much younger and bigger than the defendant and had threatened and hit him, this court rejected his self-defense claim, noting that the defendant could have left the area instead of arming himself and returning to the scene.[FN 5]

> [FN 5]  Other cases where courts rejected self-defense claims are State v. Price, 93-1472 (La.App. 4 Cir. 4/14/94), 635 So.2d 1298; State v. Moore, 568 So.2d 612 (La.App. 4 Cir. 1990); State v. Green, 505 So.2d 265 (La.App. 3 Cir. 1987); State v. Ruff, 504 So.2d 72 (La.App. 2 Cir.1987); and State v. Dill, 461 So.2d 1130 (La.App. 5 Cir. 1984).

By contrast, in State v. Williams, 483 So.2d 999 (La. 1986), the Court found that the State failed to disprove that the defendant shot the victim in self-defense.  A few days before the shooting, the victim had severely beaten the defendant and threatened to kill him.  On the day of the shooting, the defendant saw the victim approaching and tried to avoid him, but the victim confronted him, and the defendant shot the victim.  Police officers found a rifle under the victim's body, and the defendant insisted that he only shot the victim because he saw the barrel of a gun in the victim's hands.  The Court found that there was no evidence that the defendant provoked the victim or that he was the aggressor, and there was evidence that the defendant was trying to avoid the victim when the victim confronted him with a gun.

Likewise, in State v. Carroll, 542 So.2d 762 (La.App. 4 Cir. 1989), the defendant shot the victim in a barroom after they had argued earlier in the day. While one witness testified that the victim's arms were down when the defendant shot him, the bullet entered the victim under his arm, which would have been impossible if he had had his arm down at the time.  This court reversed the defendant's manslaughter conviction, finding that the evidence supported the defendant's testimony and that of other witnesses that the victim charged the defendant while brandishing a barstool.

Here, the appellant argues that this court should review both the evidence presented at trial as well as the evidence the court did not allow him to present, in determining whether there was sufficient evidence to support his conviction.

However, this court must consider only what was presented to the jury to determine if the evidence was sufficient.

The appellant correctly argues that once he raised the issue of self-defense, the State had the burden negating this defense. He points out that Off. Bono admitted that he did not see the first three shots, and he also points to the testimony of Ms. Boatner and Ms. Bickham, who both testified that the victim approached the appellant with a gun. However, only two guns were recovered from the scene, those used by Off. Bono and the appellant. Sgt. Goodly testified that the scene was secured immediately after the shooting, as the pedestrians fled the scene during the shooting. In addition, Det. Leary testified that after testing the bullets and casings seized from the scene, he found that they had been fired from only two guns, those of Off. Bono and the appellant. Off. Bono testified that he did not see a gun in the victim's hand when he turned after hearing the first three shots and saw the appellant shoot the victim.

As for the testimony of Ms. Boatner and Ms. Bickham that the victim pulled a gun on the appellant, apparently the jury did not believe the testimony of the two defense witnesses. This court has repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. Given the evidence adduced at trial and listed above, it does not appear that the jury's credibility finding was clearly contrary to the evidence. Viewing the evidence in the light most favorable to the State, the State presented sufficient evidence to negate the self-defense claim and support the jury's finding that the appellant committed second degree murder. This claim has no merit.[17]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[18]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor

---

[17] State v. Sartain, 2 So.3d 1132, 1147-50 (La. App. 4th Cir. 2008); State Rec., Vol. 6 of 13.
[18] State v. Sartain, 21 So.3d 274 (La. 2009); State Rec., Vol. 6 of 13.

v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that he has made no such showing.

As the Louisiana Fourth Circuit Court of Appeal correctly noted, claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus

31

proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.   Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Here, petitioner does not dispute that he shot the victim; rather, he claims only that he was acting in self-defense because the victim was approaching him armed with a gun.  Louisiana law provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. Rev. Stat. Ann. § 14:20(A)(1).  Therefore, in the instant case, the state had the burden of proving that petitioner did not act in self-defense. See State v. Garcia, 483 So.2d 953, 956 (La. 1986).

It is true that petitioner's version of events was corroborated by the testimony of Kayla Boatner and Makiah Bickham.  However, the third eyewitness, Officer Bono stated that he did not see a gun in the victim's hands.  Moreover, no such gun was recovered from the crime scene.

Therefore, the jurors were required to assess the witnesses' credibility and, in doing so, obviously found the testimony of petitioner, Boatner, and Bickham to lack credibility. Where, as here, the finding of guilt turns on a question of credibility, a federal habeas court generally will not grant relief on a sufficiency claim in that credibility determinations are the province of the jurors. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007). There is no basis for varying from that general rule in the instant case, and so petitioner's claim that the state presented insufficient evidence to prove that he did not act in self-defense should be rejected.

Petitioner's contention that the evidence was insufficient to show that he had the specific intent to kill the victim is also unpersuasive. Here, the evidence showed, and petitioner does not dispute, that he pointed a gun at the victim and fired. Under Louisiana law, "[s]pecific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person." State v. Neal, 796 So.2d 649, 657 (La. 2001). Therefore, this component of petitioner's claim should likewise be rejected.

In summary, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner

cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel at trial.  Because the ineffective assistance of counsel claim was rejected by the state courts on the merits in the state post-conviction proceedings,[19] and because such claims present mixed questions of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in fact doubly deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.

---

[19] Judgment dated December 12, 2014 ("Defendant has failed to establish that relief should be granted.  La.C.Cr.P. Art. 930.2."); State v. Sartain, No. 2015-K-0116 (La. App. 4th Cir. Mar. 24, 2015) ("We have reviewed the present writ application … and decline to exercise our supervisory jurisdiction."); State v. Sartain, No. 2015-K-0183 (La. App. 4th Cir. Mar. 24, 2015) ("We have reviewed the present writ application … and decline to exercise our supervisory jurisdiction."); State v. Sartain, 182 So.3d 953 (La. 2016) ("[R]elator fails to show he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."); State Rec., Vols. 2, 11, and 13 of 13.

A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 105 (citations omitted; emphasis added). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

As the Louisiana Supreme Court noted in denying relief, ineffective assistance of counsel claims must be analyzed under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as

36

of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

In the instant case, petitioner contends that his counsel was ineffective for failing to (1) move for a mistrial based on comments made by the prosecutor, (2) call additional witnesses at trial, and (3) conduct an adequate pretrial investigation.

Regarding the first contention, petitioner argues that counsel should have moved for a mistrial based on the following two comments made by the prosecutor during closing arguments:

1.    "You are here today because you live in the City of New Orleans.  And I'm here today to tell you that if you want to take your city back, you need to do it today.  You need to do it right here.  You need to do it right now and you need to do – ."[20]

---

[20] State Rec., Vol. 10 of 13, transcript of October 4, 2007, p. 59.

2.    "[H]e lied to you.  And he lied to you because wants to get out of jail.  Go back to his life.  We hear about guns and drugs all the time.  Wouldn't you rather be known for second line and Mardi Gras – ."[21]

Defense counsel objected to both comments, and both of the objections were sustained.  However, petitioner argues that counsel was ineffective for not taking the further step of requesting a mistrial based on the comments.

A decision as to whether to move for a mistrial is one of trial strategy.  See Hatch v. Lambert, 215 Fed. App'x 614, 615 (9th Cir. 2006); Brooks v. Cain, Civ. Action No. 06-1869, 2009 WL 3088323, at *17 (E.D. La. Sept. 21, 2009); Franklin v. Thompson, Civ. Action No. 07-543, 2007 WL 3046642, at *12 (E.D. La. Oct. 17, 2007).  Moreover, it is clear that the strategic decisions of counsel are accorded a large measure of deference.  For example, the United States Supreme Court has explained:

> *Judicial scrutiny of counsel's performance must be highly deferential.*  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.*

Strickland v. Washington, 466 U.S. 668, 689 (1984) (citation and quotation marks omitted; emphasis added).  In the instant case, petitioner essentially argues that counsel's decision not to

---

[21] Id. at p. 60.

move for a mistrial was so wrongheaded that the state court's decision deferring to that strategic choice was necessarily unreasonable. For the following reasons, the undersigned simply cannot agree.

Here, the defense had presented its case adequately, including presenting testimony from multiple witnesses who supported a theory of self-defense. Moreover, much could go wrong if the case were tried again from scratch – a less favorable jury might be empaneled, defense witnesses might become unavailable or change their testimony, or the state might bolster and present its case more effectively. Faced with such considerations, counsel, who knows his case and was present for the trial, is generally in the best position to weigh the relative benefits of proceeding to a verdict against attempting to force a retrial by moving for mistrial. Accordingly, a habeas court, whose knowledge of a case is limited to a cold record, should second-guess trial counsel's decisions on such matters only in the most egregious circumstances. This is not such a circumstance, and counsel's decision on this matter cannot be said to have permeated the entire trial with obvious unfairness. Therefore, this component of petitioner's ineffective assistance of counsel claim should be rejected.[22]

With respect to the contention that counsel was ineffective for failing to call additional witnesses at trial, petitioner clearly has not met his burden of proof. The United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, *we require petitioners making claims of ineffective*

---

[22] The Court notes that, at the post-conviction evidentiary hearing, petitioner's trial counsel stated that, in hindsight, he believes that he should have moved for a mistrial. However, counsel's subsequent regrets simply are not dispositive as to whether his representation at the time of trial were constitutionally adequate.

> *assistance based on counsel's failure to call a witness to demonstrate prejudice by*
> *naming the witness, demonstrating that the witness was available to testify and*
> *would have done so, setting out the content of the witness's proposed testimony,*
> *and showing that the testimony would have been favorable to a particular defense.*
> This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner presented no evidence showing that additional witnesses were available to testify at the time of trial and would in fact have testified in a manner beneficial to the defense. Therefore, he obviously failed to meet his burden of proof with respect to this claim.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v.

<u>Director, TDCJ-CID</u>, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Petitioner's contentions challenging the adequacy of counsel's pretrial investigation fare no better. Petitioner argues that counsel was ineffective for failing to secure evidence and witnesses to support a contention that petitioner had reason to shoot the victim in self-defense because the victim had previously shot him in 2004. Specifically, petitioner faults counsel for not obtaining the police reports relating to the 2004 incident.

There is no dispute that counsel did not fact obtain the 2004 police reports; he admitted that fact at the post-conviction evidentiary hearing.[23] However, even if counsel's investigation on that point could be considered to constitute deficient performance, petitioner must additionally prove that prejudice resulted in order to prevail on his claim. For the following reasons, it is evident that he has not made that showing.

The original police report, prepared by Detective Corey Lymous, reflected that the shooter was unknown.[24] The report further indicated that when Lymous went to the hospital after the shooting, petitioner was "unable to speak or remain conscious."[25] However, petitioner's mother informed Lymous "that she believed 'Chris', Jasmine Sartain's girlfriend's exboyfriend was the person that shot her son."[26] She further told Lymous that Eric Dorsey and Brandell Edwards "could attest to the accusation."[27] The report further reflected that Lymous' efforts to contact

---

[23] State Rec., Vol. 1 of 13, transcript of March 8, 2013, pp. 8-15.
[24] Rec. Doc. 1-6, p. 64.
[25] <u>Id</u>. at p. 66.
[26] <u>Id</u>.
[27] <u>Id</u>.

Dorsey were unsuccessful, that Edwards told Lymous that he did not see the shooter, and that petitioner later told Lymous that he likewise did not see who shot him.[28]

A supplemental police report prepared by an Officer Porter likewise reflected that the shooter was unknown. Porter's report stated that he interviewed both Dorsey and Edwards, but there is no indication in the report that either individual was able to identify the shooter.[29]

No information in those reports would have been helpful to the defense. Although they revealed that petitioner was accompanied by Dorsey and Edwards when he shot, that fact was already known, in that both petitioner and his mother were aware of it. Moreover, in any event, Edwards specifically stated that he did not see the shooter, and there is no suggestion whatsoever in the reports that Dorsey saw the shooter. Accordingly, even if Dorsey and Edwards were available to be called as witnesses at trial, there is no reason to believe that either could have supported petitioner's allegation that Christopher Smith was the shooter in the 2004 incident. Moreover, the mother's statement was, at best, inadmissible hearsay, and Lymous' report actually refutes petitioner's suggestion that he had seen the person who shot him. Accordingly, petitioner has not demonstrated that any information beneficial to the defense would have resulted even if counsel had obtained the police reports, and, therefore, his inadequate investigation claim necessarily fails. See, e.g., Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005) (holding that petitioner had not established that he suffered prejudice from trial counsel's allegedly deficient investigation, in that he presented no evidence showing that it would have provided counsel "with any helpful information otherwise inaccessible"); United States v. Green, 882 F.2d 999, 1003 (5th

---

[28] Id. at pp. 66-67.
[29] Id. at pp. 72-76.

Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and *how it would have altered the outcome of the trial*.  Green has been unable to show what further investigation would have revealed and *how it would have helped him*." (emphasis added; citation omitted)); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. July 16, 2009) ("[P]etitioner has brought forth *no* evidence to show that further investigation would have revealed any information whatsoever which w*ould have been beneficial to the defense*.  Without such evidence, he cannot make the required showing that he was prejudiced by the allegedly inadequate investigation."), aff'd, 641 F.3d 96 (5th Cir. 2011).

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He clearly has not made that showing in the instant case.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## **Brady Claim**

Lastly, petitioner argues that the state suppressed the aforementioned police reports in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  In the post-conviction proceedings, the state courts denied this claim on the merits.[30]

---

[30] Judgment dated December 12, 2014 ("Defendant has failed to establish that relief should be granted. La.C.Cr.P. Art. 930.2"); State v. Sartain, No. 2015-K-0116 (La. App. 4th Cir. Mar. 24, 2015) ("We have reviewed the present writ application … and decline to exercise our supervisory jurisdiction."); State v. Sartain, No. 2015-K-0183 (La. App. 4th Cir. Mar. 24, 2015) ("We have reviewed the present writ application … and decline to exercise our supervisory jurisdiction."); State v. Sartain, 182 So.3d 953 (La. 2016) ("Relator fails to show the state withhold

The AEDPA places severe limitations on this Court's review of the state court's decision rejecting petitioner's <u>Brady</u> claim.  The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a <u>Brady</u> violation.  <u>See</u> Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."); <u>Neal v. Puckett</u>, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect.").  Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).

As noted, in the last reasoned state court opinion addressing petitioner's claim, the Louisiana Supreme Court cited <u>Brady</u> as the controlling authority with respect to the claim.  Because the court correctly identified the clearly established federal law governing petitioner's claim, and because he has not pointed to (and the undersigned's research has not found) a United States Supreme Court case with materially indistinguishable facts reaching a contrary result, this Court need only determine whether the state court's application of <u>Brady</u> was "unreasonable."  For the following reasons, the undersigned concludes that it was not.

The clearly established federal law to be used in analyzing <u>Brady</u> claims is well known. As the United States Supreme Court recently reiterated:

> "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u> [v. Maryland, 373 U.S. 83,] 87, 83 S.Ct. 1194, [10 L.Ed.2d 215 (1963)]. Evidence qualifies as material when there is "'any reasonable likelihood'" it could have

---

material exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."); State Rec., Vols. 2, 11, and 13 of 13.

> "'affected the judgment of the jury.'" Giglio [v. United States, 405 U.S. 150,] 154, 92 S.Ct. 763, [31 L.Ed.2d 104 (1972)] (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).  To prevail on his Brady claim, [a petitioner] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted.  Smith v. Cain, 565 U.S. 73, ___ - ___, 132 S.Ct. 627, 629-631, 181 L.Ed.2d 571 (2012) (internal quotation marks and brackets omitted).  He must show only that the new evidence is sufficient to "undermine confidence" in the verdict.  Ibid.

Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016).  The Supreme Court has also explained:

> We have … held that the duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). … Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." [Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).]  In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S., at 437, 115 S.Ct. 1555.

Strickler v. Greene, 527 U.S. 263, 280-81 (1999).

Therefore, in summary:  to prevail on a Brady claim, a petitioner must establish three elements:  "(1) the state suppressed or withheld evidence, (2) which was both favorable and (3) material to the defense." Jackson v. Johnson, 194 F.3d 641, 648 (5th Cir. 1999).

Here, although defense counsel was not provided with the police reports, petitioner's argument that those reports contained information that was unknown to the defense or somehow helpful to the defense is simply untrue.

For example, petitioner argues that Porter's report proves that Lymous lied in testifying that he was a part of the investigation concerning the 2004 shooting.  It does not.  At the post-conviction hearing, petitioner's own counsel testified that petitioner and his mother identified

Lymous as the officer who interviewed the mother during that investigation.[31]  Moreover, Lymous prepared a contemporaneous police report documenting his role in the 2004 investigation.[32] Nothing in Porter's report refutes that.

Although the reports stated that Eric Dorsey and Brandell Edwards were with petitioner at the time of 2004 incident and were therefore potential witnesses, petitioner himself obviously already knew that fact.  Further, as previously noted, Lymous' report specifically stated that Edwards said that he did not see the shooter, and there is no suggestion whatsoever in the reports that Dorsey saw the shooter.

Additionally, although Lymous' report states that he was told by petitioner's mother that "she believed 'Chris', Jasmine Sartain's girlfriend's exboyfriend was the person that shot her son," defense counsel and the trial court were aware that the mother had purportedly told that to Lymous. However, that was of no consequence because the mother was not an eyewitness to the shooting, and her "belief" was based purely on uncorroborated hearsay.

The only arguable value of Lymous' report would be to impeach his testimony that *no* names were given to the police as to the identity of the shooter in 2004.  Again, the report indicates that a *partial* name, "Chris," was given.  However, that name was not provided by an eyewitness; rather, it was merely petitioner's mother's "belief" as to who shot her son.  Moreover, there is no indication that the police were able to use this unreliable, partial information to identify Christopher Smith as a valid suspect.

---

[31] State Rec., Vol. 1 of 13, transcript of March 8, 2013, p.11.
[32] Rec. Doc. 1-6, pp. 64-67.

In any event, even if Lymous had been successfully impeached on this point, there is no reason to believe that the judge would have ruled differently with respect to the exclusion of evidence concerning the 2004 shooting. The judge's ruling on that matter was based on the fact that the only eyewitness who purportedly identified Smith as the shooter was petitioner himself. However, Lymous' report would have cast doubt on (not supported) that identification, in that the report states:

> On October 4, 2004 Detctive [sic] C . Lymous visited the victim (Jasmine Sartain) at the Medical Center of Louisiana-New Orleans. Upon being escorted to the room by the hospital police, he waas [sic] met by a subject identified himself as the victim's father. The father exited the room. Detective C. Lymous interviewed Jasmain [sic] Sartain. Detective C. Lymous asked him "Who shot you?" Jasmine Sartain responded "I don't know." Setective C. Lymous asked "Did you see who shot you?" Jasmine Satain responded "No."[33]

In light of the foregoing, there is simply no reason to believe that the police reports would have had any impact on the trial, and the reports were obviously insufficient to "undermine confidence" in the verdict. Therefore, there is no basis for this Court to find the state court's denial of petitioner's <u>Brady</u> claim was unreasonable. Accordingly, the Court finds that, under the rigorously deferential standards of review mandated by the AEDPA, this claim should be denied.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Jasmine Sartain be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[33] Rec. Doc. 1-6, pp. 66-67.

47

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[34]

New Orleans, Louisiana, this thirty-first day of October, 2017.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[34] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.